IN THE CIRCUIT COURT OF MADISON COUNTY, MISSISSIPPI

JANIYA MORRIS, a Minor, by and through her
Court Appointed Guardian, RICHARD COURTNEY, ESE

**FILED**
THIS DAY
MAY 1 0 2012
LEE WESTBROOK
CIRCUIT CLERK

PLAINTIFF,

VS.                                            CAUSE NO. *CI-2012-0137JE*

MADISON HMA, LLC, d/b/a MADISON RIVER OAKS
HOSPITAL d/b/a MADISON RIVER OAKS MEDICAL
CENTER and DR. JAMES D. PERKINS.

DEFENDANTS.

**JURYTRIAL DEMANDED**

### COMPLAINT

#### Identity of the Parties

COME NOW, the Plaintiff, by and through her attorneys, Merkel & Cocke, P.A., and for her complaint would allege as follows:

1. The Plaintiff, Janiya Morris, is a minor resident citizen of Pickens, Holmes County, Mississippi. This Plaintiff brings this action by and through her Court Appointed Guardian, Richard Courtney, Esq.

2. The Defendant James D. Perkins, M.D., upon information and belief, is an adult resident citizen of Byram, Hinds County, Mississippi. This Defendant may be served with process at Family Health Center, 117 South 11th Ave., Laurel, MS 39440.

3. The Defendant Madison HMA, LLC d/b/a Madison River Oaks Hospital d/b/a Madison River Oaks Medical Center, upon information and belief, is a Mississippi limited liability company with its principal place of business in Flowood, Rankin County, Mississippi (hereinafter, Madison HMA). This

1


EXHIBIT
*B*

Defendant may be served with process by service upon CT Corporation System, 645 Lakeland East Drive, Suite 101, Flowood, Mississippi 39232.

## Notice

4.  Prior to bringing this action, all Defendants have been given at least 60 days written notice as required by Miss. Code Ann. § 15-1-36(15).

## Background

5.  Jasmine Boyd became pregnant on or about January 24, 2008, with an estimated date of confinement of October 30, 2008.

6.  Her mother, Jasmine Boyd, was a 16 year old, date of birth June 16, 1992, gravida 1 para 1, when she presented for labor. Her prenatal care followed an "unremarkable course" according to the Labor and Delivery records.

7.  On October 23, 2008, Jasmine Boyd presented to Madison River Oaks Medical Center ("the Hospital") where a non-stress test (hereinafter "NST") was performed.

8.  Based on a reactive NST, the patient was discharged home later that day.

9.  Jasmine Boyd again presented to the Hospital on October 30, 2008 at approximately 11:56 AM. Her biophysical profile at admission was reported as follows:

> "…[A] black female appearing stated age and minimal distress. She was alert and oriented, breath sounds clear, regular [heart] rate and rhythm without murmurs or gallops, Gravid, fundal height 38 cm. Fetal heart tones in the 130's to 140's. Normal external female genitalia. Cervix was 1 cm to 2 cm dilated, 80% effaced, minus 1 station, vertex [presentation]. Clear amniotic fluid was noted. Extremities were normal."

10.  Jasmine Boyd was placed on intravenous Ampicillin, to guard against Group B Streptococcus infection.

2

11. Shortly after admission, Jasmine Boyd was placed on an electronic fetal monitor beginning at approximately 9:44 AM. At the time the electronic fetal heart monitoring (hereinafter "EFHM") was initiated, the tracing was reactive and reassuring, showed good variability and positive accelerations. The EFHM tracing at the time of admission reflected a fetus that was healthy and well oxygenated.

12. Jasmine Boyd began experiencing contractions every 2 to 3 minutes shortly after admission that were "markedly intense" according to the Hospital's records. There was also some light meconium noted in her amniotic fluid around 2 PM.

13. After 7 hours of contractions, but minimal progress in dilatation, Jasmine Boyd was placed on a 2 mu/m Pitocin protocol due to non-progressive labor, with an increase of 2 mu/m every 15 minutes.

14. Jasmine Boyd became fully dilated later that evening, and was in second stage at or about 6:16 PM.

15. During the course of the day, the EFHM tracing began to show fetal heart rate decelerations, including but not limited to early, variable and late decelerations, of increasing severity, likely as a result of umbilical cord impingement and/or head compression. At or about 7:45 PM, as Jasmine Boyd was experiencing strong contractions, Baby Morris (in utero) showed variable and late decelerations to 90 beats per minute and lower from a 150 beat per minute (bpm) baseline heart rate. The attending doctor was made aware of these variable and late decelerations. Further, at or about 8:13 PM, late decelerations down to 90 beats per minute from the baseline were noted. As fetal heart rate decelerations increased in severity, the EFHM tracing reflected decreasing beat-to-beat variability, and eventually tachycardia. Such fetal heart rate changes indicated that the unborn baby was becoming increasingly hypoxic and/or ischemic.

16. At or about 8:58 PM, upon information and belief, Dr. Perkins returned from delivering another infant, and began delivering Baby Morris by vacuum extraction, which consisted of eight vacuum

3

pulls through and including at or about 9:16 PM. The attendant medical personnel attempted vacuum suction-assisted delivery at least eight times which failed to further descend Baby Morris (in utero). After the first attempt at vacuum suction, Baby Morris (in utero) experienced heart rate tachycardia into the 180 beats per minute and higher range throughout the next seven vacuum pulls. The attending doctor was made aware of this tachycardia at or about 9:02 PM.

17. The first pull with the vacuum was at 8:58 PM. There was a second vacuum attempt at 9:02 PM, a third attempt at 9:04 PM, a fourth attempt at 9:06 PM, a fifth attempt at 9:08 PM, a sixth attempt at 9:13 PM, a seventh attempt between 9:13-9:14 PM, and an eighth attempt at 9:16 PM.

18. At or about 9:25 PM, the Pitocin was turned off and an emergent C-section was called. During the 8 vacuum pulls, Pitocin remained running even the though the IUPC was disconnected, and there was no record of the number or force of contractions Jasmine was experiencing.

19. At or about 9:26 PM, Jasmine Boyd began feeling lightheaded and began experiencing hypertension and tachycardia. Shortly thereafter, Baby Morris (in utero) had a drop in heart rate to 60 beats per minute, and then further down to 30 beats per minute. This heart rate pattern was consistent with persistent fetal bradycardia.

20. At 9:45 PM., a Dr. Vig was notified of the order for a stat C-section secondary to fetal distress and a heart rate of only 35 beats per minute. Dr. Vig called back 15 minutes later, and informed the delivery personnel that a neonatal transport team was en route.

21. The doctors then performed an emergency C-Section delivery at or about 9:49 PM.

22. Baby Morris was born weighing 7 lbs. 15 oz., with Apgar scores corresponding to, depending the charting: 0 at 1 minute, 2 at 5 minutes, and 2 at 10 minutes, 1 at 1 minute, 2 at 5 minutes, and 3 at 10 minutes. Cord blood gases were obtained, but never recorded.

4

23. Baby Morris was described as floppy, with a dusky grey coloration, with zero respirations, muscle tone, or reflex irritability. Baby Morris was then bagged for ventilation without suctioning the trachea. Thereafter, at 9:56 PM, when she was seven minutes of age, Baby Morris was suctioned twice with what is presumed to be a gastric tube for around 20 seconds each time and meconium secretions were extracted from her airway.

24. Janiya Morris was intubated at 10:02 PM, at 13 minutes of life. Janiya Morris was a term baby, but was suctioned and intubated with a 2.5 mm endotracheal intubation tube (ETT) by Dr. CS Newcomb, who is an anesthesiologist, not a pediatrician.

25. At or about 10:05 PM, Dr. Vig was again called by a nursing supervisor, and was requested to be present in the delivery and/or neonatal resuscitation room. However, an ER doctor responded upon information and belief. Dr. Vig did not arrive at the hospital until 11:00 PM, at or about an hour after birth.

26. Blood gas measurements taken at or about two hours after birth at 11:51 PM recorded a pH: 7.303; pCO2: 30.5; pO2: 240; BE: -11; O2sat: 100%.

27. Janiya Morris was transferred to the NICU at River Oaks Women's Hospital, and manifested injuries consistent with but not limited to acute hypoxic/ischemic brain damage with multi-organ involvement, including trauma and seizures. She stayed at Woman's Hospital until November 21, 2008.

28. Plaintiff alleges that the Defendant James D. Perkins, MD (hereinafter "Dr. Perkins") was the obstetrician responsible for the labor and delivery of Jasmine Boyd and her unborn child.

29. Plaintiff alleges that, at all relevant times, Defendant Dr. Perkins was an employee and/or agent of the Defendant Madison HMA, and was at all times acting within the scope of his employment.

30. In addition to or in the alternative, Plaintiff alleges that at all relevant times, Defendant Dr. Perkins was acting independently or separate from any affiliation with any clinic, in the care and

5

treatment provided to Plaintiffs, given that he billed Medicaid for labor and delivery, independent of any prenatal clinic utilized by Plaintiffs for prior care.

31. Plaintiff alleges that Defendant Dr. Perkins and the hospital staff at Madison HMA was negligent in failing to timely deliver Janiya Morris in light of the deteriorating fetal heart rate pattern.

32. Plaintiff further alleges that Defendant Dr. Perkins and the hospital staff at Madison HMA was negligent in failing to adequately inform Jasmine Boyd, the mother, of the significance of the deterioration of the fetal heart rate tracing and in failing to obtain Jasmine Boyd's consent for continued labor.

33. Plaintiff alleges that Defendant Perkins and the hospital staff at Madison HMA was negligent in failing to offer and recommend an earlier cesarean section for the delivery of Jasmine Boyd's unborn child, Janiya Morris.

34. Plaintiff alleges that Defendant Perkins and the hospital staff at Madison HMA were all employees of the Defendant Madison HMA. Plaintiff alleges that Dr. Perkins and the doctors and nurses caring for Jasmine Boyd and Janiya Morris were negligent in failing to institute appropriate corrective measures in light of the deteriorating fetal heart rate tracing.

35. Plaintiff alleges that Defendant Perkins and the hospital staff at Madison HMA caused the damages to Plaintiffs by failing to:

a)   Carefully and adequately examine and assess the pregnant patient to determine the acute, in-hospital status of both patients including the unborn baby;

b)   Accurately and thoroughly learn and treat all pertinent aspects of the condition of the unborn baby, including but not limited to recognition and treatment of the non-reassuring heart rate changes, and proceed to timely delivery of the unborn baby;

6

c)     Recognize that the heart rate of the unborn baby as depicted on the EFHM tracing, including but not limited to while uterine contraction activity was inadequately shown by the uterine contraction monitor, represented non-reassuring fetal status, requiring in utero resuscitation, and in the absence of in utero resuscitation required performance of an earlier delivery by Cesarean section;

d)     Perform interventions to improve the condition of the unborn baby, including but not limited to administration of oxygen and fluids, repositioning to improve blood and oxygen flow from mother to baby, as well as notification of all pertinent health care providers about the non-reassuring fetal status, including anesthesia and the surgical team, and to advise the other health care providers of all in utero resuscitation actions taken, and/or pertinent information, and when such measures failed to improve the condition of the baby in utero, perform earlier cesarean delivery;

e)     Regularly and accurately monitor the vital signs of both mother and baby, including but not limited to recognizing the difference between the maternal and the fetal heart rates, and the uterine contraction activity, and moving to deliver sooner;

f)     Regularly and frequently assess and record the patients' vital signs including but not limited to the uterine contractions of the mother;

g)     Carefully assess and interpret the condition of the unborn baby, including fetal heart rate and uterine contractions, and deliver sooner;

h)     Carefully and completely learn of, and advise the patients' other treating physician(s) and/or nurses of, the history and condition of both the mother and baby as soon as possible and as changes in the condition of either patient occurred, including but not limited to non-reassuring fetal heart rate, and acute deterioration of the baby's condition

7

on the monitor, including development and/or continuation of late decelerations indicative of utero-placental insufficiency, significant variable decelerations, prolonged decelerations, and diminished and/or absent variability, and treat those conditions, including but not limited to earlier cesarean delivery;

i) Carefully and completely diagnose and treat the condition of both the mother and baby as soon as possible and as changes in the condition of either patient occurred. For example, and not by way of limitation, when there was inadequate determination of uterine contraction activity and resting tone, treat those conditions by replacement of monitoring equipment and other interventions to ascertain the uterine activity and condition of the unborn baby;

j) Carefully and completely advise the patient of her condition, and that of her unborn baby, and treat the non-reassuring status of the unborn baby, including but not limited to arrested labor, by earlier delivery by Cesarean section;

k) Carefully assess for and treat non-reassuring changes on the fetal heart monitor, including but not limited to variable decelerations, late decelerations, lack of variability, and treat for the same including with intravenous fluids, repositioning, oxygen, and timely notify a surgical team for C-section to perform an earlier emergency delivery;

l) Recognize the non-reassuring fetal monitor strip including but not limited to probable severe variable and/or late decelerations with diminished or absent variability, and treat the baby in utero, including with but not limited to by means of earlier surgical delivery upon learning via cervical exam that vaginal delivery would not be imminent;

m) Timely provide treatment, or obtain treatment from another provider or physician, for non-reassuring fetal status including fetal distress, and timely contact other health care

8

providers to address the urgent deteriorating condition of the baby, including but not limited to proceeding to an earlier emergency Cesarean section, and obtaining a physician earlier for adequate neonatal resuscitation;

n)    Utilize the chain of command when notification of the concerning signs and symptoms were not immediately responded to by other health care providers.  In other words, the health care providers should have called for or otherwise obtained physicians to treat the patients, prepare adequately for surgery, and expeditiously deliver the baby, rather than to allow the baby to continue to deteriorate at a time when the physician(s) knew or should have known that to fail to intervene with earlier delivery would substantially increase the risk of harm both to mother and baby;

o)    Carefully and adequately supervise, instruct, order, and/ or direct labor and delivery nurses and nurses working in labor and delivery;

p)    Retain a full and legible copy of the complete medical record;

q)    Avoid deterioration of the baby to the point of needing an emergency C-section such that the baby had acute metabolic acidosis.

r)    Not destroy, alter, or revise original medical records;

s)    Respond to request for assistance in a timely manner, including but not limited to the provision of timely and appropriate care and treatment in response to the request for assistance.

t)    Recognize that sustained or repeated use of vacuum assisted delivery methods, including as employed in this instance, has clinically been associated with significant risk of neonatal trauma, and thus abandon such methods once they could reasonably be considered harmful to the mother or baby, and deliver earlier.

9

u)   Recognize that use of operative delivery, specifically vacuum assisted vaginal delivery, is unacceptable in cases where there is suspected cephalopelvic disproportion and/or inadequate fetal descent.

v)   Obtain a newborn physician for care and treatment prior to birth, and take steps to ensure that the physician is present for the baby and for anticipated resuscitation and other preventative measures in a timely fashion.

w)   Have a qualified physician be present in a timely manner after notification of the need for a newborn physician to be present at birth and provide the reasonably necessary care and treatment.

x)   Adequately and timely resuscitate the depressed infant, including but not limited to providing an adequate airway with an ETT of proper size, providing medications, and resuscitation measures, including but not limited to those measures as recommended by the NRP.

y)   Adequately document patient care including but not limited to nursing notes, discharge summary, plan of care, arterial cord blood gas value(s), use or discontinuation of Pitocin/Oxytocin, and;

z)   Comply with JCAHO [Joint Commission on the Accreditation of Healthcare Organizations].

36. As a direct and proximate result of the negligence of the Defendants, Janiya Morris was born in a severely depressed state.

37. Upon information and belief, at the time of birth an umbilical cord blood gas was taken but not recorded. However, there was a base excess of -11.0 at or about 2 hours of life, reflecting a child who had suffered acute hypoxia and acidemia as a result of the lack of oxygen during labor.

10

38. The child's severely hypoxic state should have been predicted by the increasingly worsening EFHM tracing, and should have been delivered sooner.

39. APGAR scores at birth were noted to be 1 at 1 minute, 2 at 5 minutes, and 3 at 10 minutes. This is indicative of a child with severe perinatal depression. Upon birth, the child required intubation and ventilation and had depressed mental status, decreased muscle tone, and no suck reflex.

40. The child began having seizures which were documented on October 31, 2008.

41. Subsequent MRI imaging studies have confirmed hypoxic-ischemic brain damage.

42. Janiya Morris has subsequently been diagnosed with anoxic brain injury, cerebral palsy, newborn seizures and microcephaly.

43. Plaintiffs allege that Janiya Morris' injuries are of a permanent nature and were directly and proximately caused as a result of the Defendants' negligence, any or all of them.

44. As a direct and proximate result of the negligence of the Defendants, Janiya Morris has permanent neurologic damage and is likely to never walk, talk or be able to care for herself in any respect. Janiya Morris will likely have permanent disability, loss of income, loss of enjoyment of life and will require attendant care for the remainder of her life. It is alleged that Janiya Morris has incurred substantial medical expenses in the past and will incur substantial medical expenses, attendant care costs, and other substantial damages to be determined by the trier of fact for the remainder of her life.

WHEREFORE, premises considered, Plaintiff demands judgment from the Defendants in such amounts as to be determined by the jury to reasonably compensate Plaintiff for the losses sustained, in an amount in excess of the minimum jurisdictional limits of this Court. Plaintiff further demands a jury trial on issues so triable.

11

Respectfully submitted,

MERKEL & COCKE
A Professional Association
Post Office Box 1388
Clarksdale, Mississippi 38614
(662) 627-9641
(662)627-3592 telefax
Attorneys for Plaintiffs

By: _____
       WILLIAM B. RAIFORD, III (MSB # 8390)

### Attorney's Certificate

Pursuant to Mississippi Code Annotated § 11-1-58, I, the undersigned counsel for Janiya Morris and Jasmine Boyd certify that we have reviewed the facts of the case set forth in the attached Complaint, and that we have consulted with an expert qualified pursuant to the Mississippi Rules of Evidence and Rules of Civil Procedure to give expert testimony as to the standard of care and negligence, and who I reasonably believe is knowledgeable in the relevant issues involved in this action, and that I have concluded on the basis of such review and consultation that there is a reasonable basis for the commencement of this action.

MERKEL & COCKE
A Professional Association
Post Office Box 1388
Clarksdale, Mississippi 38614
(662) 627-9641
Attorneys for Plaintiff

By: _____
       WILLIAM B. RAIFORD, III
       (Miss. Bar No. 8390)

12

**COVER SHEET**
Case: 45CI1:12-cv-0013
**Civil Case Filing Form**

*(To be completed by Attorney/Party*
*Prior to Filing of Pleading)*

Mississippi Supreme Court          Form AOC/01
Administrative Office of Courts          (Rev 2009)

In the __Circuit__   Court of __Madison__   County — __MS__   Judicial District

**Origin of Suit (Place an "X" in one box only)**

| | | | |
|---|---|---|---|
| [X] Initial Filing | [ ] Reinstated | [ ] Foreign Judgment Enrolled | [ ] Transfer from Other court |
| [ ] Remanded | [ ] Reopened | [ ] Joining Suit/Action | [ ] Appeal   [ ] Other |

**Plaintiff - Party(ies) Initially Bringing Suit Should Be Entered First - Enter Additional Plaintiffs on Separate Form**

Individual   __Morris__                __Janiya__

     Last Name                First Name                Maiden Name, if applicable          M.I.          Jr/Sr/III/IV

____ Check ( x ) if Individual Plaintiff is acting as capacity as Executor(trix) or Administrator(trix) of an Estate, and enter style:
Estate of _____

____ Check ( x ) if Individual Plaintiff is acting in capacity as Business Owner/Operator (d/b/a) or State Agency, and enter entity
D/B/A or Agency _____

**Business**
    Enter legal name of business, corporation, partnership, agency - if Corporation, indicate the state where incorporated

____ Check ( x ) if Business Plaintiff is filing suit in the name of an entity other than the above, and enter below:
D/B/A _____

Address of Plaintiff __Pickens, Holmes County, MS__

Attorney (Name & Address) __William B. Raiford, III, Merkel & Cocke. P.A.__   MS Bar No. __8390__
____ Check ( x ) if Individual Filing Initial Pleading is NOT an attorney      P.O. Box 1388, Clarksdale, MS 38614
Signature of Individual Filing: _____

**Defendant - Name of Defendant - Enter Additional Defendants on Separate Form**

Individual

     Last Name                First Name                Maiden Name, if applicable          M.I.          Jr/Sr/III/IV

____ Check ( x ) if Individual Defendant is acting in capacity as Executor(trix) or Administrator(trix) of an Estate, and enter style:
Estate of _____

____ Check ( x ) if Individual Defendant is acting in capacity as Business Owner/Operator (d/b/a) or State Agency, and enter entity:
D/B/A or Agency _____

Business __Madison HMA, LLC, d/b/a Madison River Oaks Hospital, d/b/a Madison River__
    Enter legal name of business, corporation, partnership, agency - if Corporation, indicate the state where incorporated   __Oaks Medical Center__

____ Check ( x ) if Business Defendant is acting in the name of an entity other than the above, and enter below:
D/B/A _____

Attorney (Name & Address) - if Known _____   MS Bar No. _____

**Damages Sought:**   Compensatory $ _____   Punitive $ _____   Check ( x ) if child support is contemplated as an issue in this suit.*
        *If checked, please submit completed Child Support Information Sheet with this Cover Sheet

**Nature of Suit (Place an "X" in one box only)**

| | | | |
|---|---|---|---|
| [ ] Child Custody/Visitation | [ ] Accounting (Business) | [ ] Adoption - Contested | [ ] Adverse Possession |
| [ ] Child Support | [ ] Business Dissolution | [ ] Adoption - Uncontested | [ ] Ejectment |
| [ ] Contempt | [ ] Debt Collection | [ ] Consent to Abortion Minor | [ ] Eminent Domain |
| [ ] Divorce:Fault | [ ] Employment | [ ] Removal of Minority | [ ] Eviction |
| [ ] Divorce: Irreconcilable Diff. | [ ] Foreign Judgment | [ ] Other _____ | [ ] Judicial Foreclosure |
| [ ] Domestic Abuse | [ ] Garnishment | | [ ] Lien Assertion |
| [ ] Emancipation | [ ] Replevin | [ ] Elections | [ ] Partition |
| [ ] Modification | [ ] Other _____ | [ ] Expungement | [ ] Tax Sale: Confirm/Cancel |
| [ ] Paternity | | [ ] Habeas Corpus | [ ] Title Boundary or Easement |
| [ ] Property Division | [ ] Accounting (Probate) | [ ] Post Conviction Relief/Prisoner | [ ] Other _____ |
| [ ] Separate Maintenance | [ ] Birth Certificate Correction | [ ] Other _____ | |
| [ ] Termination of Parental Rights | [ ] Commitment | | [ ] Bad Faith |
| [ ] UIFSA (eff 7/1/97; formerly URESA) | [ ] Conservatorship | [ ] Breach of Contract | [ ] Fraud |
| [ ] Other _____ | [ ] Guardianship | [ ] Installment Contract | [ ] Loss of Consortium |
| | [ ] Heirship | [ ] Insurance | [ ] Malpractice - Legal |
| [ ] Administrative Agency | [ ] Intestate Estate | [ ] Specific Performance | [X] Malpractice - Medical |
| [ ] County Court | [ ] Minor's Settlement | [ ] Other _____ | [ ] Mass Tort |
| [ ] Hardship Petition (Driver License) | [ ] Muniment of Title | | [ ] Negligence - General |
| [ ] Justice Court | [ ] Name Change | [ ] Bond Validation | [ ] Negligence - Motor Vehicle |
| [ ] MS Dept Employment Security | [ ] Testate Estate | [ ] Civil Forfeiture | [ ] Product Liability |
| [ ] Worker's Compensation | [ ] Will Contest | [ ] Declaratory Judgment | [ ] Subrogation |
| [ ] Other _____ | [ ] Other _____ | [ ] Injunction or Restraining Order | [ ] Wrongful Death |
| | | [ ] Other _____ | [ ] Other _____ |

IN THE CIRCUIT COURT OF MADISON COUNTY, MISSISSIPPI

JANIYA MORRIS, a Minor, by and through her
Court Appointed Guardian, RICHARD COURTNEY, ESQ.

                                                    PLAINTIFF,

VS.                                        CAUSE NO. CI-2012-0137-JE

MADISON HMA, INC., d/b/a MADISON COUNTY
MEDICAL CENTER and DR. JAMES D. PERKINS.

                                                    DEFENDANTS.

                                           **JURY TRIAL DEMANDED**

### PLAINTIFF'S FIRST AMENDED COMPLAINT

#### Identity of the Parties

COME NOW, the Plaintiff, by and through her attorneys, Merkel & Cocke, P.A., and for her

complaint would allege as follows:

1. The Plaintiff, Janiya Morris, is a minor resident citizen of Pickens, Holmes County,

Mississippi. This Plaintiff brings this action by and through her Court Appointed Guardian, Richard

Courtney, Esq.

2. The Defendant James D. Perkins, M.D., upon information and belief, is an adult resident

citizen of Byram, Hinds County, Mississippi. This Defendant may be served with process at Family

Health Center, 117 South 11th Ave., Laurel, MS 39440.

3. The Defendant Madison HMA, Inc., d/b/a Madison County Medical Center, upon information

and belief, is a Mississippi corporation with its principal place of business in Flowood, Rankin County,

Mississippi (hereinafter, Madison HMA). This Defendant may be served with process by service upon

CT Corporation System, 645 Lakeland East Drive, Suite 101, Flowood, Mississippi 39232.

1


EXHIBIT
tabbies
B
(CONT)

### Notice

4. Prior to bringing this action, all Defendants have been given at least 60 days written notice as required by Miss. Code Ann. § 15-1-36(15).

### Background

5. Jasmine Boyd became pregnant on or about January 24, 2008, with an estimated date of confinement of October 30, 2008.

6. Her mother, Jasmine Boyd, was a 16 year old, date of birth June 16, 1992, gravida 1 para 1, when she presented for labor. Her prenatal care followed an "unremarkable course" according to the Labor and Delivery records.

7. On October 23, 2008, Jasmine Boyd presented to Madison County Medical Center ("the Hospital") where a non-stress test (hereinafter "NST") was performed.

8. Based on a reactive NST, the patient was discharged home later that day.

9. Jasmine Boyd again presented to the Hospital on October 30, 2008 at approximately 11:56 AM. Her biophysical profile at admission was reported as follows:

> "...[A] black female appearing stated age and minimal distress. She was alert and oriented, breath sounds clear, regular [heart] rate and rhythm without murmurs or gallops, Gravid, fundal height 38 cm. Fetal heart tones in the 130's to 140's. Normal external female genitalia. Cervix was 1 cm to 2 cm dilated, 80% effaced, minus 1 station, vertex [presentation]. Clear amniotic fluid was noted. Extremities were normal."

10. Jasmine Boyd was placed on intravenous Ampicillin, to guard against Group B Streptococcus infection.

11. Shortly after admission, Jasmine Boyd was placed on an electronic fetal monitor beginning at approximately 9:44 AM. At the time the electronic fetal heart monitoring (hereinafter "EFHM") was

2

initiated, the tracing was reactive and reassuring, showed good variability and positive accelerations. The EFHM tracing at the time of admission reflected a fetus that was healthy and well oxygenated.

12.   Jasmine Boyd began experiencing contractions every 2 to 3 minutes shortly after admission that were "markedly intense" according to the Hospital's records. There was also some light meconium noted in her amniotic fluid around 2 PM.

13.   After 7 hours of contractions, but minimal progress in dilatation, Jasmine Boyd was placed on a 2 mu/m Pitocin protocol due to non-progressive labor, with an increase of 2 mu/m every 15 minutes.

14. Jasmine Boyd became fully dilated later that evening, and was in second stage at or about 6:16 PM.

15. During the course of the day, the EFHM tracing began to show fetal heart rate decelerations, including but not limited to early, variable and late decelerations, of increasing severity, likely as a result of umbilical cord impingement and/or head compression. At or about 7:45 PM, as Jasmine Boyd was experiencing strong contractions, Baby Morris (in utero) showed variable and late decelerations to 90 beats per minute and lower from a 150 beat per minute (bpm) baseline heart rate. The attending doctor was made aware of these variable and late decelerations. Further, at or about 8:13 PM, late decelerations down to 90 beats per minute from the baseline were noted. As fetal heart rate decelerations increased in severity, the EFHM tracing reflected decreasing beat-to-beat variability, and eventually tachycardia. Such fetal heart rate changes indicated that the unborn baby was becoming increasingly hypoxic and/or ischemic.

16. At or about 8:58 PM, upon information and belief, Dr. Perkins returned from delivering another infant, and began delivering Baby Morris by vacuum extraction, which consisted of eight vacuum pulls through and including at or about 9:16 PM. The attendant medical personnel attempted vacuum suction-assisted delivery at least eight times which failed to further descend Baby Morris (in utero). After

3

the first attempt at vacuum suction, Baby Morris (in utero) experienced heart rate tachycardia into the 180 beats per minute and higher range throughout the next seven vacuum pulls. The attending doctor was made aware of this tachycardia at or about 9:02 PM.

17. The first pull with the vacuum was at 8:58 PM. There was a second vacuum attempt at 9:02 PM, a third attempt at 9:04 PM, a fourth attempt at 9:06 PM, a fifth attempt at 9:08 PM, a sixth attempt at 9:13 PM, a seventh attempt between 9:13-9:14 PM, and an eighth attempt at 9:16 PM.

18. At or about 9:25 PM, the Pitocin was turned off and an emergent C-section was called. During the 8 vacuum pulls, Pitocin remained running even the though the IUPC was disconnected, and there was no record of the number or force of contractions Jasmine was experiencing.

19. At or about 9:26 PM, Jasmine Boyd began feeling lightheaded and began experiencing hypertension and tachycardia. Shortly thereafter, Baby Morris (in utero) had a drop in heart rate to 60 beats per minute, and then further down to 30 beats per minute. This heart rate pattern was consistent with persistent fetal bradycardia.

20. At 9:45 PM., a Dr. Vig was notified of the order for a stat C-section secondary to fetal distress and a heart rate of only 35 beats per minute. Dr. Vig called back 15 minutes later, and informed the delivery personnel that a neonatal transport team was en route.

21. The doctors then performed an emergency C-Section delivery at or about 9:49 PM.

22. Baby Morris was born weighing 7 lbs. 15 oz., with Apgar scores corresponding to, depending the charting: 0 at 1 minute, 2 at 5 minutes, and 2 at 10 minutes, 1 at 1 minute, 2 at 5 minutes, and 3 at 10 minutes. Cord blood gases were obtained, but never recorded.

23. Baby Morris was described as floppy, with a dusky grey coloration, with zero respirations, muscle tone, or reflex irritability. Baby Morris was then bagged for ventilation without suctioning the trachea. Thereafter, at 9:56 PM, when she was seven minutes of age, Baby Morris was suctioned twice

4

with what is presumed to be a gastric tube for around 20 seconds each time and meconium secretions were extracted from her airway.

24. Janiya Morris was intubated at 10:02 PM, at 13 minutes of life. Janiya Morris was a term baby, but was suctioned and intubated with a 2.5 mm endotracheal intubation tube (ETT) by Dr. CS Newcomb, who is an anesthesiologist, not a pediatrician.

25. At or about 10:05 PM, Dr. Vig was again called by a nursing supervisor, and was requested to be present in the delivery and/or neonatal resuscitation room. However, an ER doctor responded upon information and belief. Dr. Vig did not arrive at the hospital until 11:00 PM, at or about an hour after birth.

26. Blood gas measurements taken at or about two hours after birth at 11:51 PM recorded a pH: 7.303; pCO2: 30.5; pO2: 240; BE: -11; O2sat: 100%.

27. Janiya Morris was transferred to the NICU at River Oaks Women's Hospital, and manifested injuries consistent with but not limited to acute hypoxic/ischemic brain damage with multi-organ involvement, including trauma and seizures. She stayed at Woman's Hospital until November 21, 2008.

28. Plaintiff alleges that the Defendant James D. Perkins, MD (hereinafter "Dr. Perkins") was the obstetrician responsible for the labor and delivery of Jasmine Boyd and her unborn child.

29. Plaintiff alleges that, at all relevant times, Defendant Dr. Perkins was an employee and/or agent of the Defendant Madison HMA, and was at all times acting within the scope of his employment.

30. In addition to or in the alternative, Plaintiff alleges that at all relevant times, Defendant Dr. Perkins was acting independently or separate from any affiliation with any clinic, in the care and treatment provided to Plaintiffs, given that he billed Medicaid for labor and delivery, independent of any prenatal clinic utilized by Plaintiffs for prior care.

31. Plaintiff alleges that Defendant Dr. Perkins and the hospital staff at Madison HMA was negligent in failing to timely deliver Janiya Morris in light of the deteriorating fetal heart rate pattern.

32. Plaintiff further alleges that Defendant Dr. Perkins and the hospital staff at Madison HMA was negligent in failing to adequately inform Jasmine Boyd, the mother, of the significance of the deterioration of the fetal heart rate tracing and in failing to obtain Jasmine Boyd's consent for continued labor.

33. Plaintiff alleges that Defendant Perkins and the hospital staff at Madison HMA was negligent in failing to offer and recommend an earlier cesarean section for the delivery of Jasmine Boyd's unborn child, Janiya Morris.

34. Plaintiff alleges that Defendant Perkins and the hospital staff at Madison HMA were all employees of the Defendant Madison HMA. Plaintiff alleges that Dr. Perkins and the doctors and nurses caring for Jasmine Boyd and Janiya Morris were negligent in failing to institute appropriate corrective measures in light of the deteriorating fetal heart rate tracing.

35. Plaintiff alleges that Defendant Perkins and the hospital staff at Madison HMA caused the damages to Plaintiffs by failing to:

a)      Carefully and adequately examine and assess the pregnant patient to determine the acute, in-hospital status of both patients including the unborn baby;

b)      Accurately and thoroughly learn and treat all pertinent aspects of the condition of the unborn baby, including but not limited to recognition and treatment of the non-reassuring heart rate changes, and proceed to timely delivery of the unborn baby;

c)      Recognize that the heart rate of the unborn baby as depicted on the EFHM tracing, including but not limited to while uterine contraction activity was inadequately shown by the uterine contraction monitor, represented non-reassuring fetal status, requiring in utero

6

resuscitation, and in the absence of in utero resuscitation required performance of an earlier delivery by Cesarean section;

d)  Perform interventions to improve the condition of the unborn baby, including but not limited to administration of oxygen and fluids, repositioning to improve blood and oxygen flow from mother to baby, as well as notification of all pertinent health care providers about the non-reassuring fetal status, including anesthesia and the surgical team, and to advise the other health care providers of all in utero resuscitation actions taken, and/or pertinent information, and when such measures failed to improve the condition of the baby in utero, perform earlier cesarean delivery;

e)  Regularly and accurately monitor the vital signs of both mother and baby, including but not limited to recognizing the difference between the maternal and the fetal heart rates, and the uterine contraction activity, and moving to deliver sooner;

f)  Regularly and frequently assess and record the patients' vital signs including but not limited to the uterine contractions of the mother;

g)  Carefully assess and interpret the condition of the unborn baby, including fetal heart rate and uterine contractions, and deliver sooner;

h)  Carefully and completely learn of, and advise the patients' other treating physician(s) and/or nurses of, the history and condition of both the mother and baby as soon as possible and as changes in the condition of either patient occurred, including but not limited to non-reassuring fetal heart rate, and acute deterioration of the baby's condition on the monitor, including development and/or continuation of late decelerations indicative of utero-placental insufficiency, significant variable decelerations, prolonged

7

        decelerations, and diminished and/or absent variability, and treat those conditions, including but not limited to earlier cesarean delivery;

i)     Carefully and completely diagnose and treat the condition of both the mother and baby as soon as possible and as changes in the condition of either patient occurred. For example, and not by way of limitation, when there was inadequate determination of uterine contraction activity and resting tone, treat those conditions by replacement of monitoring equipment and other interventions to ascertain the uterine activity and condition of the unborn baby;

j)     Carefully and completely advise the patient of her condition, and that of her unborn baby, and treat the non-reassuring status of the unborn baby, including but not limited to arrested labor, by earlier delivery by Cesarean section;

k)    Carefully assess for and treat non-reassuring changes on the fetal heart monitor, including but not limited to variable decelerations, late decelerations, lack of variability, and treat for the same including with intravenous fluids, repositioning, oxygen, and timely notify a surgical team for C-section to perform an earlier emergency delivery;

l)     Recognize the non-reassuring fetal monitor strip including but not limited to probable severe variable and/or late decelerations with diminished or absent variability, and treat the baby in utero, including with but not limited to by means of earlier surgical delivery upon learning via cervical exam that vaginal delivery would not be imminent;

m)   Timely provide treatment, or obtain treatment from another provider or physician, for non-reassuring fetal status including fetal distress, and timely contact other health care providers to address the urgent deteriorating condition of the baby, including but not

limited to proceeding to an earlier emergency Cesarean section, and obtaining a physician earlier for adequate neonatal resuscitation;

n)    Utilize the chain of command when notification of the concerning signs and symptoms were not immediately responded to by other health care providers. In other words, the health care providers should have called for or otherwise obtained physicians to treat the patients, prepare adequately for surgery, and expeditiously deliver the baby, rather than to allow the baby to continue to deteriorate at a time when the physician(s) knew or should have known that to fail to intervene with earlier delivery would substantially increase the risk of harm both to mother and baby;

o)    Carefully and adequately supervise, instruct, order, and/ or direct labor and delivery nurses and nurses working in labor and delivery;

p)    Retain a full and legible copy of the complete medical record;

q)    Avoid deterioration of the baby to the point of needing an emergency C-section such that the baby had acute metabolic acidosis.

r)    Not destroy, alter, or revise original medical records;

s)    Respond to request for assistance in a timely manner, including but not limited to the provision of timely and appropriate care and treatment in response to the request for assistance.

t)    Recognize that sustained or repeated use of vacuum assisted delivery methods, including as employed in this instance, has clinically been associated with significant risk of neonatal trauma, and thus abandon such methods once they could reasonably be considered harmful to the mother or baby, and deliver earlier.

9

u)   Recognize that use of operative delivery, specifically vacuum assisted vaginal delivery, is unacceptable in cases where there is suspected cephalopelvic disproportion and/or inadequate fetal descent.

v)   Obtain a newborn physician for care and treatment prior to birth, and take steps to ensure that the physician is present for the baby and for anticipated resuscitation and other preventative measures in a timely fashion.

w)   Have a qualified physician be present in a timely manner after notification of the need for a newborn physician to be present at birth and provide the reasonably necessary care and treatment.

x)   Adequately and timely resuscitate the depressed infant, including but not limited to providing an adequate airway with an ETT of proper size, providing medications, and resuscitation measures, including but not limited to those measures as recommended by the NRP.

y)   Adequately document patient care including but not limited to nursing notes, discharge summary, plan of care, arterial cord blood gas value(s), use or discontinuation of Pitocin/Oxytocin, and;

z)   Comply with JCAHO [Joint Commission on the Accreditation of Healthcare Organizations].

36. As a direct and proximate result of the negligence of the Defendants, Janiya Morris was born in a severely depressed state.

37. Upon information and belief, at the time of birth an umbilical cord blood gas was taken but not recorded. However, there was a base excess of -11.0 at or about 2 hours of life, reflecting a child who had suffered acute hypoxia and acidemia as a result of the lack of oxygen during labor.

38. The child's severely hypoxic state should have been predicted by the increasingly worsening EFHM tracing, and should have been delivered sooner.

39. APGAR scores at birth were noted to be 1 at 1 minute, 2 at 5 minutes, and 3 at 10 minutes. This is indicative of a child with severe perinatal depression. Upon birth, the child required intubation and ventilation and had depressed mental status, decreased muscle tone, and no suck reflex.

40. The child began having seizures which were documented on October 31, 2008.

41. Subsequent MRI imaging studies have confirmed hypoxic-ischemic brain damage.

42. Janiya Morris has subsequently been diagnosed with anoxic brain injury, cerebral palsy, newborn seizures and microcephaly.

43. Plaintiffs allege that Janiya Morris' injuries are of a permanent nature and were directly and proximately caused as a result of the Defendants' negligence, any or all of them.

44. As a direct and proximate result of the negligence of the Defendants, Janiya Morris has permanent neurologic damage and is likely to never walk, talk or be able to care for herself in any respect. Janiya Morris will likely have permanent disability, loss of income, loss of enjoyment of life and will require attendant care for the remainder of her life. It is alleged that Janiya Morris has incurred substantial medical expenses in the past and will incur substantial medical expenses, attendant care costs, and other substantial damages to be determined by the trier of fact for the remainder of her life.

WHEREFORE, premises considered, Plaintiff demands judgment from the Defendants in such amounts as to be determined by the jury to reasonably compensate Plaintiff for the losses sustained, in an amount in excess of the minimum jurisdictional limits of this Court. Plaintiff further demands a jury trial on issues so triable.

11

Respectfully submitted,

MERKEL & COCKE
A Professional Association
Post Office Box 1388
Clarksdale, Mississippi 38614
(662) 627-9641
(662)627-3592 telefax
Attorneys for Plaintiffs

    /s/ William B. Raiford, III
WILLIAM B. RAIFORD, III (MSB # 8390)

### Attorney's Certificate

Pursuant to Mississippi Code Annotated § 11-1-58, I, the undersigned counsel for Janiya Morris and Jasmine Boyd certify that we have reviewed the facts of the case set forth in the attached Complaint, and that we have consulted with an expert qualified pursuant to the Mississippi Rules of Evidence and Rules of Civil Procedure to give expert testimony as to the standard of care and negligence, and who I reasonably believe is knowledgeable in the relevant issues involved in this action, and that I have concluded on the basis of such review and consultation that there is a reasonable basis for the commencement of this action.

MERKEL & COCKE
A Professional Association
Post Office Box 1388
Clarksdale, Mississippi 38614
(662) 627-9641
Attorneys for Plaintiff

    /s/ William B. Raiford, III
WILLIAM B. RAIFORD, III (MSB # 8390)

### CERTIFICATE OF SERVICE

THIS IS TO CERTIFY that on June 20, 2012 I electronically filed a true and correct copy of the above and foregoing document to the Clerk of the Court using the ECT filing system with copies to:

Mark P. Caraway, Esq.
Wise, Carter, Child & Caraway
P.O. Box 651
Jackson, MS  39205

12

Richard A. Courtney, Esq. CELA
Frascogna Courtney, PLLC
4400 Old Canton Road, Suite 220
Jackson, MS  39211

James D. Perkins, M.D.
117 South 11th Ave.
Laurel, MS  39440

THIS 20th day of June, 2012.

                                    /s/ William B. Raiford, III
                              WILLIAM B. RAIFORD, III (MSB 8390)